**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| PIERRE PINSON, | ) | | |
| | ) | Civil Action No. 14 – 416 | |
| Petitioner, | ) | | |
| | ) | | |
| v. | ) | District Judge Joy Flowers Conti | |
| | ) | Magistrate Judge Lisa Pupo Lenihan | |
| BRIAN COLEMAN and THE | ) | | |
| ATTORNEY GENERAL OF THE | ) | | |
| STATE OF PENNSYLVANIA, | ) | | |
| | ) | | |
| | ) | | |
| Respondents. | ) | | |

## OPINION

### I.    Introduction

Presently before the court is a motion for relief from judgment filed by petitioner Pierre Pinson ("Pinson" or "petitioner") pursuant to Federal Rule of Civil Procedure 60(b).  (ECF No. 40.)  The motion was referred to a United States Magistrate Judge pursuant to the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1), and Rules 72.C and 72.D of the Local Rules of Court.

On August 29, 2022, the magistrate judge issued a report and recommendation ("R&R") wherein she recommended that Pinson's motion be denied and that a certificate of appealability also be denied. (ECF No. 44.)  On October 19, 2022, Pinson filed a motion requesting proper development of the record (ECF No. 47). The court construes the motion requesting proper development of record as objections to a portion of the R&R.

On October 19, 2022, Pinson also filed a motion for court order to unseal records and order the Commonwealth to turn over all internal affairs records with respect to detective Dennis Logan. (ECF No. 48.) On November 10, 2022, Pinson filed an

"addendum" to his "original filing." (ECF No. 49.) On November 29, 2022, Pinson filed a motion to withdraw the addendum. (ECF No. 50.) On December 1, 2022, Pinson filed a motion for subpoena duces tecum. (ECF No. 51.)

For the reasons set forth in this opinion, the R&R will be adopted in part; Pinson's objections will be overruled; Pinson's Rule 60(b) motion will be denied for the reasons set forth in the R&R, as modified and supplemented by this opinion; the motion for court order to unseal records and order the Commonwealth to turn over all internal affairs records with respect to detective Dennis Logan (ECF No. 48) and motion for subpoena duces tecum (ECF No. 51) will be denied; and the motion to withdraw addendum (ECF No. 49) will be granted.

## II.    Procedural History and Background

On October 21, 1999, Pinson was charged in the Commonwealth of Pennsylvania with four counts of attempted homicide, four counts of aggravated assault, one count of criminal conspiracy and one count of carrying a firearm without a license. See Commonwealth v. Pinson, CP-02-CR-0013750-1999 (Allegheny Cty. Common Pleas Ct.). The charges stemmed from an incident in which shots were fired into a police station on August 27, 1999. A jury trial commenced on July 19, 2000. The jury found Pinson guilty of four counts of aggravated assault, one count of criminal conspiracy, and one count of carrying a firearm without a license. Pinson was acquitted of the four counts of attempted homicide. The court sentenced Pinson to an aggregate prison term of 35 to 90 years. Pinson took a direct appeal of his conviction, which was not successful. Pinson filed three petitions pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 PA. CONS. STAT. § 9541. The third PCRA appeal ended on

February 26, 2014. The Superior Court of Pennsylvania summarized the evidence

produced at Pinson's trial at CP-02-CR-0013750-1999 as follows:

> The evidence presented at trial established that on August 27, 1999, Pittsburgh Police Officers Stephen Mescan, Michael Boyd, Darlene Gardner and Tracy Carson were at work in the Zone 6 Police Station on Northumberland Street in the Squirrel Hill section of the City of Pittsburgh. At approximately 3:00 a.m., numerous shots were fired at the police station. Bullets entered through the primarily wood and glass building front. Officers dove for cover and turned off lights so they would not be seen. Two officers stated that they could hear the "whiz" of a bullet passing right by their heads. One bullet struck Officer Steph[e]n Mescan in the foot. Witnesses could not definitively say the actual number of shots fired at the station, but there were (5) five holes in the front of the police station, and at least six shots fired into vehicles parked directly in front of the station. Casings and slugs were found in the street in front of the station, and there were bullet holes on the walls inside. Ballistics tests showed that the weapons used in the shooting were a 9 mm and a .45 caliber automatic.
>
> Zhen Dong Ling, a delivery driver for the New York Times, was driving on Northumberland Street approximately two (2) blocks from the police station when he heard five to six "pops" like a firecracker. Then a vehicle drove past him, coming from the direction of the police station at a high rate of speed. The vehicle was a dark sports utility vehicle which looked like a Jeep, possibly black or dark green. Mr. Ling could not see the occupant or occupants in the vehicle.
>
> A few hours later, Megan Siegal awoke to find that her Black Jeep Cherokee had been stolen. Ms. Siegal, who lived five (5) blocks from the Zone 6 police station, had last seen her vehicle parked outside at approximately 11:00 p.m. on August 26, 1999. When she awoke to find the Jeep gone, she called police and reported [it] stolen. She received a call around 4:30 p.m. on August 27, 1999, from police informing her that her vehicle had been recovered in a post office parking lot in the East Liberty section of the City of Pittsburgh. Postal workers had called to report that a black Jeep Grand Cherokee had been left in the lot all day with its engine running. One postal worker had noticed the Jeep parked in the lot when he arrived for work at 5:45 a.m. Ms. Siegal met a police officer in the post office parking lot and confirmed that it was her vehicle. However, Mrs. Siegal noticed that there was a plastic Snapple brand iced tea bottle that did not belong to her, and there were bullet casings in the vehicle. Also, someone had written on the headliner (felt covering of the roof inside the vehicle) in the front seat area, writing which had not been there the night before when she left her car in her parking space. The writing on the headliner on the drivers side was "thank you." The writing on the passenger side headliner was "Fucc the Piggz", spelled and written in a very distinctive manner.

Ballistics test later showed that the casings found inside Ms. Siegal's Jeep matched those found at the scene of the Zone 6 shooting.

During the investigation police received information that [Pinson] and his codefendant had perpetrated the shooting at the Zone 6 police station. Acting upon the information, police detectives visited Pinson's co-defendant, Ricky Boyer, approximately two (2) weeks after the incident. Boyer agreed to be interviewed at the detective's office and, after waiving his rights, confessed to the shooting, as well as other crimes. Boyer detailed his involvement, as well as that of [Pinson.] An arrest warrant was issued for [Pinson] and he was taken into custody on September 19, 1999. He was interviewed by detectives after he waived his rights and signed a pre-interrogation warning form. [Pinson] then confessed to his involvement in the shooting, as well as the other crimes he committed with Boyer.

\* \* \*

Pinson confessed to being a passenger in the stolen jeep during the shooting. Several witnesses testified to seeing a similar, dark colored jeep near the scene of the crime. Pinson also admitted firing shots at the police station from a .45 caliber weapon (the same caliber as the shell casings found at the scene), and writing "FUCC THE PIGGZ" (the same language used in his tattoo) on the headliner of the stolen jeep. In addition, various drawings were recovered from Pinson's cell in which he stylized the words "FUC" and "THE PIGZ." The confession, along with the eyewitnesses' statements, and the physical evidence recovered from the scene, constituted overwhelming evidence of Pinson's guilt.

(ECF No. 9-6 at 2-4, 17-18.)

On October 27, 1999, Pinson was charged in the Allegheny County Court of Common Pleas with three counts of robbery, two counts of criminal conspiracy and one count of attempted robbery. The charges stemmed from Pinson's attempted robbery and actual robbery of a QwiCash store. See Commonwealth v. Pinson, CP-02-CR-0014157-1999 (Allegheny Cty. Common Pleas Ct.). A jury trial commenced on July 26, 2000. The jury convicted Pinson of all counts. The court sentenced Pinson to an aggregate prison term of 15 to 60 years, which he was ordered to serve consecutively to the sentence imposed at CP-02-CR-0013750-1999, which is detailed above. Pinson filed a direct appeal of his conviction and sentence and a PCRA petition. The PCRA petition at this case number was the same as the third PCRA petition filed at CP-02-CR-

0013750-1999. His PCRA appeal ended on February 26, 2014. The Superior Court of

Pennsylvania summarized the evidence presented at Pinson's trial at CP-02-CR-

0014157-1999 as follows:

> Terry Williams was the manager of a QwiCash store. The store provided money services such as check cashing and Western Union Moneygrams. On August 30, 1999, Mr. Williams witnessed two men wearing bandanas attempting to break into the QwiCash before normal business hours. Mr. Williams fled to the back of the store and called 911. The two men were unable to gain entry to the store at that time. The following day, Pinson and his accomplice, Ricky Boyer, entered the store during business hours. Boyer began firing a silver handgun at the security windows inside the store which separated the customers from the employees. Witnesses testified they saw Pinson brandishing a black handgun during the robbery. It is unclear, however, whether Pinson actually fired his weapon. One customer, Bridget Ways, was caught in the melee. She dropped her money on the floor during the shooting, and Pinson and Boyer absconded with that money.

> Following an investigation, the police were able to secure an arrest warrant for Pinson. The police served the warrant at the apartment of an unnamed third party, who granted the police access to the apartment. The leaseholder signed a "consent to search" form and permitted the police to search her apartment. During the search, the police seized a black .45 caliber handgun from under a pillow in a bedroom. Subsequently, the police obtained a warrant to search a car registered to a Ms. Florence Charles. During the search, police found a box of .45 caliber shells along with an identification card and a learner's permit in the name of Pierre Pinson. Fourteen shells were missing from the case. Detective Alexander testified that no fingerprints could be obtained from the black handgun. The Commonwealth's expert testified that the weapon found during Pinson's arrest had not been fired during the robbery at the QwiCash.

> Pinson filed a motion to suppress his statements to the police. At the pre-trial suppression hearing, Detective Logan testified that he read the pre-interrogation warning form to Pinson after his arrest, handed the form to Pinson to read, re-read the form to Pinson and then asked Pinson if he agreed to speak with him. Detective Logan testified that Pinson agreed to speak with him and then signed the form. Detective Logan testified that, at no time, did Pinson either ask to speak with a lawyer, or invoke his right to remain silent and refuse to answer questions. Detective Logan also denied having promised leniency or forcing him to make any statements. Detective Logan testified the interrogation took approximately four hours.

At trial, Detective Logan testified that, during interrogation, Pinson confessed to attempting to rob the QwiCash on August 30, 1999, and robing it on August 31. Detective Logan testified that Pinson admitted he and "another man" attempted to rob the store because they believed there was $56,000.00 inside. In his confession, Pinson denied having a gun during the incident. He did admit, however, that he and Boyer took the $90 Ms. Ways dropped on the floor during the incident. At trial, Pinson denied any involvement in the incidents at the QwiCash.

At trial, Pinson's co-defendant, Boyer, also denied having made any admissions to Detective Logan. Boyer also testified that he had not been involved in either the robbery or the attempted robbery of the QwiCash. He stated he had not read or understood his signed confession. Boyer also testified that he wrote a letter of apology to the victims only because the police threatened him.

(ECF No. 9-33 at 14-17.)

On March 31, 2014, Pinson—without paying the filing fee or a motion to proceed in forma pauperis—filed a petition for writ of habeas corpus in this court. (ECF No. 1.) On April 1, 2014, the Clerk of Court marked the case closed. (ECF No. 2.) After Pinson paid the filing fee, he refiled the petition for writ of habeas corpus (the "petition") on May 12, 2014. (ECF No. 3.) The respondents moved to dismiss the petition on timeliness grounds arguing that it was untimely by more than four years at CP-02-CR-0013750-1999, and by more than eight years at CP-02-CR-0014157-1999. (ECF No. 9.) On October 14, 2014, the magistrate judge issued a report and recommendation, and recommended that the petition be dismissed as untimely filed. (ECF No. 13.) The undersigned in a memorandum opinion and order overruled Pinson's objections to the report and recommendation (ECF No. 14), adopted the report and recommendation, dismissed the petition as untimely, and declined to issue a certificate of appealability. (ECF No. 15.)

Pinson appealed, and the Third Circuit Court of Appeals denied his request for a certificate of appealability. (ECF No. 19.) Pinson filed a request for authorization to file a

second or successive petition for writ of habeas corpus, which the Third Circuit Court of Appeals denied. See C.A. No. 18-2027 (3d Cir.).

On January 16, 2019, Pinson filed his first Rule 60(b) motion in this case. (ECF No. 24.) The magistrate judge issued a report and recommendation and recommended that the motion be denied. The undersigned adopted the report and recommendation and denied the Rule 60(b) motion. (ECF Nos. 33 & 34.) The Third Circuit Court of Appeal denied Pinson's request for a certificate of appealability with respect to the first Rule 60(b) motion. (ECF Nos. 38 & 39.)

After this court dismissed the petition as untimely filed on November 24, 2014, Pinson filed another PCRA petition in his state court cases. On June 21, 2016, that PCRA petition was dismissed. On June 8, 2017, the Pennsylvania Superior Court affirmed the dismissal of that PCRA petition. On February 6, 2018, the Pennsylvania Supreme Court denied Pinson an allowance of appeal.

On December 3, 2019, Pinson filed another PCRA petition. On August 3, 2020, that PCRA petition was dismissed. On October 22, 2021, the Superior Court affirmed the dismissal. On March 14, 2022, the Pennsylvania Supreme Court denied Pinson an allowance of appeal.

On July 18, 2022, Pinson filed his second Rule 60(b) motion with this court. (ECF No. 40.) On August 29, 2022, the magistrate judge filed the R&R recommending that the court deny the second Rule 60(b) motion because Pinson did not satisfy his burden to show that "extraordinary circumstances" exist to relieve Pinson from the final judgment entered against him in this case. (ECF No. 44 at 20.) Pinson was informed that any written objections to the R&R were due within fourteen days from the date of the service of the R&R. (Id. at 21.) Pinson filed a motion requesting additional time to

file objections to the R&R, which the magistrate judge granted. (ECF Nos. 45 and 46.)

The magistrate judge ordered that any objection to the R&R be filed on or before

November 4, 2022. (ECF No. 46.)

On October 19, 2022, Pinson filed: (1) a motion requesting proper development

of the record (ECF No. 47); and (2) a motion for court order to unseal records and order

the Commonwealth to turn over all internal affairs records with respect to detective

Dennis Logan (ECF No. 48). The court construes the motion requesting proper

development of record as objections to a portion of the R&R.

On November 10, 2022, Pinson filed an "addendum" to his "original filing." (ECF

No. 49.) On November 29, 2022, Pinson filed a motion to withdraw the addendum. (ECF

No. 50.) On December 1, 2022, Pinson filed a motion for subpoena duces tecum. (ECF

No. 51.) Pinson's pending motions are now ripe for disposition by the court.

### III.    Standard of Review

In resolving a party's objections, the court conducts a *de novo* review of any part

of the report and recommendation to which "specific written objections" have been

made. FED. R. CIV. P. 72(b); 28 U.S.C. § 636(b)(1). The court "may accept, reject, or

modify the recommended disposition[,]…receive further evidence[,]…or return the

matter to the magistrate judge with instructions." FED. R. CIV. P. 72(b)(3).

One district court has explained:

> When no objection to a magistrate's report and recommendation is made
> the district court reviews the report and recommendation for plain
> error. See Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987) ("While
> ... [28 U.S.C. § 636(b)(1) ] may not require, in the absence of objections,
> the district court to review the magistrate's report before accepting it, we
> believe that the better practice is for the district judge to afford some level
> of review to dispositive legal issues raised by the report."); see also Tice v.
> Wilson, 425 F. Supp. 2d 676, 680 (W.D. Pa. 2006) *aff'd*, 276 Fed. App'x 125
> (3d Cir. 2008)(explaining that, by failing to object to a portion of a report and

recommendation, the litigant "waived its right to have this Court conduct a *de novo* review," and that in those circumstances, "the scope of [the court's] review is far more limited and is conducted under the far more deferential standard of 'plain error' ").

Flagstar Bank, FSB v. Mook, No. CV 2016-95, 2018 WL 4517447, at *1 (D.V.I. Sept. 20,

2018); see Price v. Westmoreland Cnty. Prison, No. 2:21-CV-1726, 2022 WL 4133341,

at *1 (W.D. Pa. Sept. 12, 2022).

## IV.   Discussion

### A.  Applicable Law with respect to Rule 60(b)(6)

Rule 60(b) provides:

**(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.**

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

FED. R. CIV. P. 60(b).

Here, Pinson in the pending Rule 60(b) motion argues that he is entitled to relief

in light of the Third Circuit Court of Appeals' decision in Bracey v. Superintendent

Rockview SCI, 986 F.3d 274, 280 (3d Cir. 2021), and because he is actually innocent.

The magistrate judge in the R&R analyzed Pinson's Rule 60(b) motion under Rule 60(b)(6), and Pinson did not object to the magistrate judge analyzing his motion under Rule 60(b)(6). The court agrees with the magistrate judge's determination that Pinson's arguments arise under Rule 60(b)(6), and, therefore, will analyze Pinson's motion under Rule 60(b)(6) to determine whether "any other reason…justifies relief" from this court's order dismissing his petition as untimely filed.

"Rule 60(b)(6) is a catch-all provision that authorizes [the] court to grant relief from a final judgment for 'any . . . reason' other than those listed elsewhere in [Rule 60(b)]." Cox v. Horn, 757 F.3d 113, 120 (3d Cir. 2014) (quoting FED. R. CIV. P. 60(b)(6)). Rule 60(b)(6) "provides 'a grand reservoir of equitable power to do justice in a particular case.'" Id. at 122 (quoting Hall v. Cmty. Mental Health Ctr., 772 F.2d 42, 46 (3d Cir. 1985)). "The grant or denial of a Rule 60(b)(6) motion is an equitable matter left . . . to the discretion of [the] district court." Id. at 124. The court is, however, "to dispense [its] broad powers under [Rule] 60(b)(6) only in 'extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur.'" Id. at 120 (quoting Sawka v. Healtheast, Inc., 989 F.2d 138, 140 (3d Cir. 1993)). "[The] movant . . . bears the burden of establishing entitlement to [Rule 60(b)(6)] equitable relief. . . ." Id. at 122 (citing Mayberry v. Maroney, 558 F.2d 1159, 1163 (3d Cir. 1977)).

The court will address the two circumstances Pinson argues are extraordinary and entitle him to Rule 60(b)(6) relief below.

### B.  Intervening Change in the Law

Pinson in his objections argues that the magistrate judge erred in the R&R by concluding that—despite Pinson's citations to Bracey and the alleged Brady material withheld by the prosecution in his state-court case—his petition was untimely filed. The

court will conduct a de novo review of Pinson's pending Rule 60(b) motion to the extent he argues he is entitled to Rule 60(b) relief based upon the intervening change in law, i.e., <u>Bracey</u>.

The United States Court of Appeals for the Third Circuit has "consistently articulated . . . that intervening changes in the [controlling] law *rarely* justify relief from final judgments under [Rule] 60(b)(6)." <u>Cox</u>, 757 F.3d at 121 (citing <u>Reform Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections</u>, 174 F.3d 305, 311 (3d Cir. 1999) (*en banc*)) (emphasis in original); <u>cf.</u> <u>Agostini v. Felton</u>, 521 U.S. 203, 239 (1997) ("Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)."). The court must employ a "flexible, multifactor approach to Rule 60(b)(6) motions . . . built upon a post-judgment change in the law . . . that takes into account all the particulars of [the] movant's case." <u>Id.</u> at 122 (citing <u>Coltec Indus., Inc. v. Hobgood</u>, 280 F.3d 262, 274 (3d Cir. 2002)).

First, the court must determine whether the change of law relied upon by Pinson is "material to the basis on which…[this] court initially denied habeas relief." <u>Bracey</u>, 986 F.3d at 284 (citing <u>Norris v. Brooks</u>, 794 F.3d 401, 404–05 (3d Cir. 2015)). If the change of law is material to the basis upon which this court initially denied Pinson habeas relief, the court must consider the factors set forth by the Third Circuit Court of Appeals in <u>Cox v. Horn</u>, 757 F.3d 113, 122 (3d Cir. 2014) (the "<u>Cox</u> factors"), to determine whether the change in law constitutes *extraordinary circumstances* warranting relief under Rule 60(b)(6). The <u>Cox</u> factors are:

> (1) the effect of the change in decisional law on our prior ruling, which carries "particular weight where ... that change concerns a 'constitutional rule or right for criminal defendants,' " (2) the merits of the petitioner's underlying claim for habeas relief, (3) principles of finality and comity, (4)

the petitioner's diligence in pursuing review, and (5) the imperative of correcting a fundamentally unjust incarceration.

White v. Vaughn, No. CV 94-6598, 2022 WL 17993129, at *4 (E.D. Pa. Dec. 29, 2022) (citing Bracey, 986 F.3d at 295-96).

**1. Whether Bracey is material to this court's determination that Pinson's petition was untimely filed**

A discussion of Bracey and this court's dismissal of Pinson's petition is necessary to determine whether Bracey—the law upon which Pinson relies in his Rule 60(b)(6) motion—is material to the court's decision.

**a. Bracey**

The Third Circuit Court of Appeals in Bracey explained the import of the prosecution's duty to disclose exculpatory and material information to a defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), in connection with a petitioner's duty to "exercise due diligence" to discover the factual predicate of his or her habeas claims, pursuant to 28 U.S.C. § 2244(d)(1). Under Brady and its progeny, the prosecution must disclose to the defense evidence that is both exculpatory and material; indeed, "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" United States v. Higgs, 713 F.2d 39, 41 (3d Cir. 1983) (quoting Brady, 373 U.S. at 87). Under Brady, "even though a defendant has not made a specific request for exculpatory material, the prosecutor is under a duty to volunteer evidence 'obviously of such substantial value to the defense that elementary fairness requires it to be disclosed.'" Id. (quoting United States v. Agurs, 427 U.S. 97, 110 (1976), holding modified by United States v. Bagley, 473 U.S. 667 (1985)).

Following Brady, lower courts placed certain limitations on the materials the government must produce. For example, courts held that "[t]he government…[was] not obliged under Brady to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." United States v. Prior, 546 F.2d 1254, 1259 (5th Cir. 1977); Wright v. Hopper, 169 F.3d 695, 702 (11th Cir. 1999), cert. denied, 528 U.S. 934 (1999) ("The prosecution is not required to furnish a defendant with exculpatory evidence that is fully available to him through the exercise of due diligence."); United States v. Dean, 722 F.2d 92, 95 (5th Cir. 1983) ("Brady rights are not denied where the information was fully available to the defendant and his reason for not obtaining and presenting such information was his lack of reasonable diligence."); 2 CHARLES ALAN WRIGHT, ANDREW D. LEIPOLD, PETER J. HENNING, & SARAH N. WELLING, FEDERAL PRACTICE AND PROCEDURE § 256 (4th ed. 2016) ("Evidence equally available to the defendant by the exercise of due diligence means that the government is not obligated under Brady to produce it.").

"[T]he United States Supreme Court[, however,] has never recognized an affirmative due diligence duty of defense counsel as part of Brady yet alone an exception to the mandate of Brady." Dennis v. Sec'y, Pennsylvania Dep't of Corr., 834 F.3d 263, 290 (3d Cir. 2016). The court of appeals in Dennis explained:

> The Supreme Court has noted that its precedent "lend[s] no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed." Banks, 540 U.S. at 695, 124 S.Ct. 1256. To the contrary, defense counsel is entitled to presume that prosecutors have "discharged their official duties." Id. at 696, 124 S.Ct. 1256 (quoting Bracy v. Gramley, 520 U.S. 899, 909, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997)). Further, the duty to disclose under Brady is absolute—it does not depend on defense counsel's actions. United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("[I]f the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to

produce, that duty should equally arise even if no request is made."). <u>Brady's</u> mandate and its progeny are entirely focused on prosecutorial disclosure, not defense counsel's diligence.

...

That the government may be burdened by the <u>Brady</u> rule does not undercut its need to comply with it. The imposition of an affirmative due diligence requirement on defense counsel would erode the prosecutor's obligation under, and the basis for, <u>Brady</u> itself.

<u>Id.</u> at 290.

In <u>Bracey</u>, the court of appeals considered whether its holding in <u>Dennis</u> impacted a petitioner's duty to exercise due diligence to discover the factual predicate of his or her habeas claims under 28 U.S.C. § 2244(d)(1)(D). Section 2244(d)(1)(D), which governs the timeliness of state court habeas petitions filed in federal court, provides:

**(d)(1)** A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

**(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

**(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

**(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

**<u>(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.</u>**

28 U.S.C. § 2244(d)(1) (emphasis added).

In <u>Bracey</u>, the petitioner was convicted in state court of murder and sentenced to life in prison. The prosecution's evidence relied heavily upon the testimony of two cooperators. At trial, the prosecution presented testimony that, among other things, the

14

cooperators received favorable plea agreements in exchange for their testimony against the petitioner. Fifteen years after his conviction, the petitioner learned that the government at trial did not disclose all the criminal cases that were pending against the cooperators. Based upon that information, the petitioner filed a PCRA petition in the state court. The state courts, however, dismissed the petition as time barred because "the factual basis of the claim could have 'been ascertained [earlier] by the exercise of due diligence.'" Bracey, 986 F.3d at 280 (quoting 42 PA. CONS. STAT. § 9545(b)(1)(ii)) (alteration in original)).

One year later, the petitioner filed a federal habeas petition "asserting Brady claims based on the allegedly withheld material exculpatory evidence." Id. The district court dismissed the petition as untimely and explained:

> [R]egardless of the prosecution's "alleged lack of full disclosure, including the specific terms of the plea agreements and possible maximum penalties [for] each of the witnesses," JA 74—§ 2244(d)(1)(D) obliges a defendant who is aware of witnesses' favorable plea agreements to continually seek out "the full extent of those plea agreements," even after the defendant is convicted, JA 75…."[B]ecause the full extent of the plea agreements and the sentences received by the witnesses were a matter of public record," Bracey "could have found the factual predicate of [his Brady] claim through the exercise of due diligence well before October 2010," id., meaning that he had filed his petition more than one year after the "factual predicate" for his Brady claim "could have been discovered through the exercise of due diligence," 28 U.S.C. § 2244(d)(1)(D).

Id. The petitioner appealed the district court's ruling, but the court of appeals did not issue a certificate of appealability based upon "then-existing case law." Id.

After the court of appeals decided Dennis, the petitioner filed in the district court a motion for relief from judgment, pursuant to Rule 60(b). He argued that there is no "due diligence" requirement under Brady, and, likewise, § 2244(d)(1)(D) "does not require petitioners in his position to undertake efforts to find exculpatory material."

Bracey, 986 F.3d at 280-81. The district court denied the motion without a reference to or discussion of Dennis. The petitioner appealed and the court of appeals certified three questions:

> (a) whether a COA is required in an appeal from the denial of a Rule 60(b) motion seeking reconsideration of the dismissal of a federal habeas petition on procedural grounds; (B) if a COA is required, whether one should be granted here; and (C) if a COA is granted, whether the District Court abused its discretion in denying Bracey's Rule 60(b) motion without considering Dennis's effect on its previous decision dismissing Bracey's habeas petition.

Id. at 281. The court of appeals answered the first two questions in the affirmative and held that the petitioner required a certificate of appealability and the petitioner was entitled to a certificate of appealability in the case. Id. at 283-284.

With respect to the third question, i.e., whether the district court abused its discretion when it denied the petitioner's Rule 60(b) motion, the court of appeals analyzed whether the petitioner satisfied his burden to show that extraordinary circumstances warranted relief under Rule 60(b)(6). The court of appeals first analyzed whether Dennis was a change in decisional law material to the district court's dismissal of the petitioner's Rule 60(b) motion as untimely under § 2244(d)(1)(D). The court of appeals in Bracey recognized that Dennis "did not involve § 2244(d)(1)(D) directly and did not alter that provision's requirement that a petitioner exercise 'reasonable diligence in the circumstances…'" Id. at 290.

The court of appeals explained the import of Dennis with respect to the case before it, i.e., a case in which a habeas petitioner alleged a Brady violation, as follows:

> § 2244(d)(1)(D) asks whether a "person in [the petitioner's] position would reasonably expect" that independent investigation would yield evidence of a Brady violation, Wilson, 426 F.3d at 661, and Dennis answers that, absent evidence to the contrary, a petitioner would reasonably expect—and, indeed, "is entitled to presume," 834 F.3d at 290—the exact opposite: that there is no Brady violation to be discovered.

16

Bracey, 986 F.3d at 291. Based upon the foregoing, the court of appeals recognized that Dennis was a change in decisional law material to the district court's dismissal of the petitioner's Rule 60(b) motion as untimely. The court of appeals explained: "The [d]istrict [c]ourt dismissed…[the petitioner's] habeas petition as untimely because the allegedly undisclosed Brady material was a matter of public record, meaning…[the petitioner] had failed to 'exercise…due diligence.'" Id. at 294 (quoting 28 U.S.C. § 2241(d)(1)(D)).

Second, the court of appeals in Bracey considered whether the district court "properly applied the totality-of-the-circumstances analysis" to determine whether the petitioner satisfied his burden to show that the change in law set forth in Dennis and the facts of the case presented extraordinary circumstances warranting Rule 60(b)(6) relief. The court of appeals explained that a district court should consider the factors identified in Cox to "answer that question." Bracey, 986 F.3d at 295. The district court in Bracey, however, did not address the Cox factors or conduct any analysis of the issue; rather, "it issued a one-page order that summarily rejected relief without citing Cox, addressing any of the Cox factors, or even acknowledging the material change in law discussed in the motion." Id. at 296. The court of appeals held that—under those circumstances—the district court abused its discretion. Id. The court of appeals vacated the judgment of the district court and remanded the case for the district court to "'take the first pass at weighing" the Cox factors, conduct additional factfinding, and consider additional briefing. Id.

On remand, the district court appointed counsel to represent the petitioner and scheduled an evidentiary hearing. Bracey v. Lamas, No. 3:11-CV-2329, 2022 WL 4111865, at *7 (M.D. Pa. Sept. 8, 2022) ("Lamas"). The parties, however, agreed to

cancel the evidentiary hearing and provided a stipulated factual record in lieu of the hearing. The court relied upon the court of appeals' holding that Dennis "was material to the dismissal of…[the petitioner's] petitioner because it clarified that a defendant 'can reasonably expect—and is entitled to presume—that the government fulfilled its Brady obligations because the prosecution's duty to disclose is absolute and in no way hinges on efforts by the defense.'" Id. (quoting Bracey, 986 F.3d at 279).

The court in Lamas then considered the Cox factors. It concluded that: the change of law announced in Dennis was not extraordinary because—as the Supreme Court recognized in Gonzalez v. Crosby, 545 U.S. 524, 534-35 (2005)—an "after-the-fact change in decisional law interpreting AEDPA's one-year statute of limitations is not by itself an extraordinary circumstance[;]" the alleged Brady material was not material to the petitioner's guilt or innocence because the witnesses to which it applied "were heavily impeached at trial[;]" and principles of finality and comity weighed against a finding of extraordinary circumstances because the petitioner's conviction and sentence became final nearly 30 years prior to the court's decision and his petition was dismissed four years before Dennis was decided. The court found that the petitioner was diligent in pursuing his Dennis claim, but that factor alone did not constitute extraordinary circumstances in light of the other Cox factors. Id. at *10-11. On that basis, the court in Lamas denied the petitioner's Rule 60(b)(6) motion and declined to issue a certificate of appealability. Id. at *11.

As discussed above, Pinson relies upon Bracey to show that extraordinary circumstances exist in this case that warrant relief under Rule 60(b)(6). A discussion of this court's decision to dismiss Pinson's petition as untimely is warranted to understand

whether <u>Bracey</u> was a change in decisional law material to this court's dismissal of the petitioner's Rule 60(b) motion as time barred.

### b. This court's decision dismissing Pinson's petition as untimely filed

Pinson filed his petition in this case on March 31, 2014. On July 30, 2014, defendants filed a motion to dismiss the petition arguing, among other things, that the petition was untimely filed. (ECF No. 9.) Pinson filed a response in opposition to the motion. On October 14, 2014, the magistrate judge issued a report and recommendation that the court should dismiss the petition as untimely filed. Pinson filed objections to the report and recommendation. On November 14, 2014, this court overruled the objections filed by Pinson and adopted as the opinion of the court the report and recommendation of the magistrate judge that the motion to dismiss the petition be denied as untimely filed. (ECF No. 15.)

The magistrate judge in the report and recommendation explained that the petition was untimely filed with respect to both of Pinson's state-court cases:

> The statute of limitations set out in § 2244(d)(1) must be applied on a claim-by-claim basis. <u>Fielder v. Varner</u>, 379 F.3d 113 (3d Cir. 2004), <u>cert[.] denied</u>, 543 U.S. 1067 (2005). In analyzing whether a petition for writ of habeas corpus has been timely filed under the one-year limitations period, a federal court must undertake a three-part inquiry. First, the court must determine the "trigger date" for the one-year limitations period pursuant to section 2244(d)(1). Second, the court must determine whether any "properly filed" applications for post-conviction or collateral relief were pending during the limitations period that would toll the statute pursuant to section 2244(d)(2). Third, the court must determine whether any of the other statutory exceptions or equitable tolling should be applied on the facts presented.

(ECF No. 13 at 12.) Applying the foregoing three-part analysis to this case, the magistrate judge explained that with respect to CP-02-CR-0013750-1999:

1.  The trigger date for the purpose of the AEDPA was the date that Pinson's judgment of sentence became final pursuant to § 2244(d)(1)(A), which was November 26, 2002, and the one-year (365-day) statute of limitations began to run the next day;[1]

2.  The statute of limitations ran for 280 days until Pinson filed his first PCRA petition on September 3, 2003. On that date, the statute of limitations was tolled and remained tolled until the conclusion of those proceedings before the Pennsylvania Supreme Court on August 20, 2009. As of August 20, 2009, Pinson had 85 days to file a timely petition in this court. The statute of limitations was not tolled during the pendency of Pinson's second (October 28, 2009 through April 27, 2012) or third (and May 10, 2012 through February 26, 2014) PCRA petitions because the Pennsylvania state courts determined those petitions were time barred under applicable PCRA law. Based upon the foregoing, the 85 days remaining for Pinson to file his petition at the conclusion of his first PCRA proceedings expired on November 13, 2009, i.e., 85 days after August 20, 2009;[2] and

---

[1]     The magistrate judge explained:

Petitioner was sentenced on September 12, 2000. He timely appealed to the Pennsylvania Superior Court, and Petitioner's judgment of sentence was affirmed (1642 WDA 2000) on March 27, 2002. The Pennsylvania Supreme Court denied Petitioner's PAA (218 WAL 2002) on August 28, 2002. Pursuant to Rule 13 of the Supreme Court of the United States, Petitioner then had 90 days to file a petition for a writ of certiorari, which he did not do. Therefore, his sentence became final for AEDPA purposes on November 26, 2002, and his one-year limitations period for filing a federal habeas corpus petition started to run the next day.

(ECF No. 13 at 13.)

[2]     The magistrate judge explained:

As to the second inquiry, the one-year limitations period was tolled during the pendency of Petitioner's "properly filed" state post-conviction proceedings pursuant to section 2244(d)(2). Two-hundred eighty (280) days of Petitioner's one-year AEDPA limitations period elapsed before Petitioner filed his first PCRA petition on September 3, 2003, which tolled the statute of limitations until the Pennsylvania Supreme Court denied Petitioner's PAA on August 20, 2009. See Stokes v. District Attorney of the County of Philadelphia, 247 F.3d 539 (3d Cir. 2001) (The statute of limitations is not tolled during the time period in which petitioner may file a petition for writ of certiorari following the appeal of a denial of a state post-conviction proceeding).

3. Even if the statute of limitations was tolled during the pendency of Pinson's second and third PCRA petitions, the petition was untimely filed in this court because 391 unaccounted for days, 26 more than allotted for by § 2244, lapsed between Pinson's trigger date, i.e., November 26, 2002, and the date he filed his petition in this court, i.e., March 31, 2014.[3]

---

Following the conclusion of Petitioner's first PCRA proceedings, sixty-eight (68) days elapsed before he filed his second PCRA petition on October 28, 2009, which was ultimately dismissed as untimely by the PCRA court. On March 28, 2012, the Pennsylvania Superior Court affirmed, concluding that Petitioner's second PCRA petition was time-barred, and that the PCRA court lacked jurisdiction to entertain the merits of Petitioner's claims. Petitioner did not pursue a PAA with the Pennsylvania Supreme Court, and his time for doing so expired on April 27, 2012.

Following the conclusion of Petitioner's second PCRA proceedings, twelve (12) days elapsed before he filed his third PCRA petition on May 10, 2012, which was also dismissed as untimely by the PCRA court on November 15, 2012. On July 16, 2013, the Pennsylvania Superior Court affirmed, concluding that Petitioner's third PCRA petition was time-barred, and that the PCRA court lacked jurisdiction to entertain the merits of Petitioner's claims. On February 26, 2014, the Pennsylvania Supreme Court denied Petitioner's PAA. Because Petitioner's second and third PCRA petitions were deemed untimely by the PCRA and Pennsylvania Superior courts, they were not "properly filed" pursuant to section 2244(d)(2), and, therefore, the time they were pending (October 28, 2009 through April 27, 2012 and May 10, 2012 through February 26, 2014) did not toll any portion of Petitioner's one-year AEDPA limitations period. See Pace v. DiGuglielmo, 544 U.S. 408, 414 (2005) ("When a postconviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2).") (internal quotation omitted). As such, the time for Petitioner to file his federal habeas petition expired on November 13, 2009….Because he did not file it until March 30, 2014, over four years and four months later, the petition is untimely.

(ECF No. 13 at 13-14.)

[3]     The magistrate judge explained:

Even assuming that Petitioner were given the benefit of tolling during the time his second and third PCRA proceedings were pending in the state courts, his federal habeas petition would still be untimely. Two-hundred eighty (280) days elapsed between the time Petitioner's judgment of sentence became final and the time he filed his first PCRA petition, sixty-eight (68) days elapsed between the time Petitioner's first PCRA proceedings concluded and the time he initiated his second PCRA proceedings, twelve (12) days elapsed between the time Petitioner's

(ECF No. 13 at 13-14.) Based upon the foregoing, the magistrate judge (and this court by adoption of the report and recommendation) concluded that the petition was untimely filed in this court with respect to CP-02-CR-0013750-1999.

Applying the three-part framework to CP-02-CR-0014157-1999, the magistrate judge concluded:

1. The date on which the one-year statute of limitations for the filing of the petition in this court began to run is the date that Pinson's judgment of sentence became final, which was June 28, 2004. The one-year statute of limitations began to run the next day. Because there was no basis for tolling the one-year statute of limitations, Pinson's petition in this court was due on or before June 28, 2005;

2. Pinson first filed for PCRA relief in state court with respect to CP-02-CR-0014157-1999 on May 10, 2012, i.e., nearly seven years after the one-year statute of limitations expired, and, therefore, his request for relief in the PCRA court was time barred. Thus, Pinson did not properly file any PCRA petitions that tolled the one-year statute of limitations, pursuant to § 2244(d)(2); and

3. There was no other basis, e.g., a statutory exception or equitable tolling, that tolled the one-year statute of limitations.

(ECF No. 13 at 16.) Based upon the foregoing, the magistrate judge—and this court via adoption of the report and recommendation—concluded that Pinson's petition in this court with respect to CP-02-CR-0014157-1999 was untimely filed.

### c. Bracey—material change of law

---

second PCRA proceedings concluded and the time he initiated his third PCRA proceedings, and thirty-one (31) days elapsed between the time his third PCRA proceedings concluded and the time he initiated these federal habeas proceedings. In total, three-hundred ninety-one (391) days elapsed between filings, so Petitioner's federal habeas petition would be untimely by twenty-six (26) days even if this Court were to grant Petitioner the equitable tolling he seeks. Accordingly, the petition should be dismissed as untimely as to CC No. 199913750.

(ECF No. 13 at 15.)

Pinson in his petition argued that the prosecution in his state-court cases failed to disclose Brady material.   Pinson in his pending Rule 60(b) motion alleges that the prosecution withheld impeachment material in the form of: (1) information about a civil rights case filed pursuant to 42 U.S.C. § 1983, i.e., Manns v. City of Pittsburgh, Civ. A. No. 00-838 (W.D. Pa. May 1, 2000), in which the plaintiff alleged the prosecution's star witness in Pinson's state-court cases, i.e., detective Dennis Logan ("Logan"), among other police officers, unlawfully interrogated the plaintiff; and (2) an Office of Municipal Investigations ("OMI") report detailing allegations of misconduct by Logan. According to Pinson, he learned about the Manns case in 2002 and learned about the OMI report on February 11, 2011. This court via adoption of the report and recommendation denying Pinson's petition as untimely determined the trigger dates for the one-year statute of limitations applicable to his petition was the date on which each of his convictions became final pursuant to § 2244(d)(1)(A), which was November 26, 2002, for CP-02-CR-0013750-1999, and June 28, 2004, CP-02-CR-0014157-1999. This court—via the adoption of the report and recommendation—did not consider whether February 11, 2011, the date on which Pinson learned about the OMI Report, i.e., the alleged undisclosed Brady material, was the trigger date for the one-year statute of limitations applicable to Pinson's petition.

One district court has explained the import of Bracey as follows:

> Bracey holds a petitioner asserting Brady violations must petition within one year of the date he obtains reason to expect investigation would yield evidence of a Brady violation.

Winn v. Ferguson, Civ. A. No. 19-3089, 2022 WL 1557778, at *3 (E.D. Pa. May 16, 2022). Under those circumstances, an argument may be made that Pinson's one-year statute of limitations with respect to any claim based upon the prosecution's alleged failure to produce the OMI report began to run on February 11, 2011 (as opposed to the dates on

which his convictions and sentences became final), and, therefore, <u>Bracey</u> is a change in law material to the basis upon which this court originally denied Pinson's petition. The court, therefore, must consider the <u>Cox</u> factors to determine whether Pinson satisfied his burden to show that extraordinary circumstances exist warranting relief under Rule 60(b)(6).

In the R&R, the magistrate judge concluded that Pinson did not satisfy his burden to show that extraordinary circumstances exist in this case because, in part, <u>Bracey</u> did not "alter…the Court's ruling that Petitioner's <u>Brady</u> claim was untimely, or, in other words, that it was filed within one year of the date on which Petitioner had reason to believe that the prosecution may have violated its duty of disclosure." (ECF  No. 44 at 11.) While <u>Bracey</u> may not alter the ultimate disposition of this case, the court must consider <u>Bracey</u> because—pursuant to <u>Bracey</u>—the trigger date for Pinson's alleged <u>Brady</u> claim concerning the OMI report was February 11, 2011, i.e., the date on which he learned about the OMI report, and not the dates on which his convictions and sentences became final. Under those circumstances, the court must consider the <u>Cox</u> factors to determine whether Pinson showed extraordinary circumstances exist in this case warranting Rule 60(b)(6) relief. The court will undertake that analysis below.

### 2.   <u>Cox</u> Factors

As discussed above, the <u>Cox</u> factors are:

> (1) the effect of the change in decisional law on our prior ruling, which carries "particular weight where ... that change concerns a 'constitutional rule or right for criminal defendants,' " (2) the merits of the petitioner's underlying claim for habeas relief, (3) principles of finality and comity, (4) the petitioner's diligence in pursuing review, and (5) the imperative of correcting a fundamentally unjust incarceration.

<u>White</u>, 2022 WL 17993129, at *4. Each factor will be addressed.

### a.  The effect of the change in decisional law on our prior ruling factor

As the magistrate judge concluded, even considering <u>Bracey</u> and assuming Pinson

has a meritorious <u>Brady</u> claim, the outcome of Pinson's petition would be the same; it

would be dismissed as untimely filed. In his petition, Pinson argues:

> Petitioner was recently provided a data sheet of the Office of
> Municipal investigations ("OMI"), detailing allegations of misconduct by
> Homicide Detective Dennis A. Logan, the linchpin in the Commonwealth's
> case against Petitioner. **Petitioner learned of the facts contained in the
> OMI data sheet on February 11, 2011, when another inmate, Charles
> Jones gave him a copy that report. SEE: (Affidavit of Charles Jones
> attached).**
>
> **The quest for information regarding Detective Logan began in
> or about the year 2002 when Petitioner heard from a third party that
> the improper and coercive tactics used by Detective Dennis Logan to
> secure confessions from suspects was widespread and may have
> been reported. Upon reading a news article that indicated Detective
> Logan was found liable in a Federal District Court of violating a
> suspects['] rights Petitioner was even more diligent in searching for
> any information relevant to validating the allegation.** Those efforts
> included, inter alia, formal requests pursuant to the Right to Know and
> Freedom of Information Acts. Petitioner went so far as writing the Attorney
> General of Pennsylvania. SEE: (Attached letters). At one point the Law
> Department for the City of Pittsburgh informed Petitioner that any
> information relating to Detective Dennis Logan is excluded under the right
> to know law. [sic] SEE: (Attached response letter dated April 13, 2004).
> **Consequently, despite Petitioner's diligence his efforts had been
> unsuccessful until February 6, 2011.** As the claims were filed within 60
> days of the date the information had been secured by Petitioner.

(ECF No. 3 at 9 (emphasis added).) Accepting the foregoing assertions as true, Pinson—

at the latest—learned about the <u>Manns</u> case in 2002 and learned about the OMI report

on or about February 11, 2011. Pursuant to <u>Bracey</u> and assuming the <u>Manns</u> case was

<u>Brady</u> material, the trigger date for Pinson's petition with respect to the <u>Manns</u> case was

a date in **2002**. Pursuant to <u>Bracey</u> and assuming the OMI report was <u>Brady</u> material, the

trigger date for Pinson's petition with respect to the OMI report would be **February 11,**

**2011**. Pursuant to § 2244(d)(1), Pinson had one year from those trigger dates to file his

petition in this court, i.e., until 2003 with respect to the <u>Manns</u> case, and until February 11, 2012, with respect to the OMI report. Pinson, however, did not file his petition in this court until **March 30, 2014**, i.e., more than eleven years after the statute of limitations expired with respect to the <u>Manns</u> case and more than two years after the statute of limitations expired with respect to the OMI report.

It appears from the record that Pinson's second PCRA petition was pending in the state courts when he discovered the OMI report, i.e., from October 28, 2009, through March 28, 2012, and his third PCRA petition was pending in the state courts from May 10, 2012, through February 26, 2014. As the magistrate judge explained, however, the state courts determined that under Pennsylvania law, i.e., 42 PA. CONS. STAT. § 9545, the second and third PCRA petitions were untimely filed. Under those circumstances, Pinson's filing of the second and third PCRA petitions did not toll the statute of limitations, pursuant to 28 U.S.C. § 2244(d)(2).[4] (ECF No. 40 (citing <u>Artuz v. Bennett</u>, 531 U.S. 4, 8, 11 (2000); <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 414 (2005); <u>Merritt v. Blaine</u>, 326 F.3d 157, 165-66 (3d Cir. 2003)); <u>see</u> <u>Jenkins v. Superintendent of Laurel Highlands</u>, 705 F.3d 80, 85 (3d Cir. 2013) ("[I]f a state court determines that an application is untimely, 'that [is] the end of the matter' for purposes of statutory tolling of AEDPAs limitation period…'regardless of whether it also addressed the merits of the claim, or whether its

---

[4]     Section 2244(d)(2) provides:

> The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

<u>Id.</u>

timeliness ruling was 'entangled' with the merits[.]"). Based upon the foregoing, this factor weighs heavily against a finding that extraordinary circumstances exist in this case that warrant Rule 60(b)(6) relief because—even if <u>Bracey</u> is applied—the petition was untimely filed.

This factor also weighs against a finding that extraordinary circumstances exist in this case because "'[i]t is hardly extraordinary'" that—after a district court dismisses as untimely a petition under "then-controlling circuit precedent"—the court of appeals changes course with respect to its interpretation of § 2244(d)(1). <u>Lamas</u>, 2022 WL 4111865, at *9 (quoting <u>Gonzalez v. Crosby</u>, 545 U.S. 524, 527 (2005)).

**b.  The merits of the petitioner's underlying claim for habeas relief**

The court need only consider the merits of Pinson's petition to the extent he raised claims based upon violations of <u>Brady</u> because <u>Bracey</u> was a material change in the law with respect to only those claims. <u>Winn</u>, 2022 WL 155778, at *4 ("Assuming <u>Bracey</u> warranted Rule 60 relief, we would consider only the underlying <u>Brady</u> claim which <u>Bracey</u> makes timely and not…[petitioner's] untimely ineffective-assistance-of-counsel claims which <u>Bracey</u> cannot excuse."). As discussed above, Pinson in the Rule 60(b) motion pending before the court argues that the prosecution in his state court cases violated <u>Brady</u> when it did not produce to him: (1) "the entire <u>Manns</u> case file as documented in the Western District Court at 2:00-cv-838[;]" and (2) the OMI report with respect to Logan. (ECF No. 40 at 7.)

**i.    <u>Brady material</u>**

One district court recently explained:

> Under <u>Brady</u>, suppression of evidence that is favorable to a defendant and material to the defendant's guilt or punishment violates the defendant's right to due process. <u>Brady</u>, 373 U.S. at 87. <u>Brady</u> applies to

both exculpatory evidence and evidence that could be used to impeach witnesses. See Bracey, 986 F.3d at 285 n.10; Giglio v. United States, 405 U.S. 150, 154 (1972). There are three components to a Brady violation: (1) the evidence at issue "must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the evidence "must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). To establish prejudice, the petitioner must establish a reasonable probability that a different result would have occurred if the evidence had not been suppressed. Id. at 291. A mere possibility of a different result is not sufficient. Id. A reasonable probability occurs when suppression of the evidence 'undermines confidence in the outcome of the trial.' " Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)).

Lamas, 2022 WL 4111865, at *9. The Third Circuit Court of Appeals has explained that

the materiality prong of the Brady analysis does not require that the Brady material be

admissible at trial. Dennis v. Sec'y, Pennsylvania Dep't of Corr., 834 F.3d 263, 310 (3d

Cir. 2016). The court of appeals explained:

> "[I]nadmissible evidence may be material if it could have led to the discovery of admissible evidence. Furthermore … we think that inadmissible evidence may be material if it could have been used effectively to impeach or corral witnesses during cross-examination. Thus, the admissibility of the evidence itself is not dispositive for Brady purposes. Rather, the inquiry is whether the undisclosed evidence is admissible itself or could have led to the discovery of admissible evidence that could have made a difference in the outcome of the trial sufficient to establish a "reasonable probability" of a different result."

Id. (quoting Johnson v. Folino, 705 F.3d 117 (3d Cir. 2013)).

Based upon the foregoing, the proper inquiry is whether the alleged Brady

material is admissible, whether it is impeachment material, _**or**_ whether the prosecution's

disclosure of the alleged Brady material could have led to the discovery of admissible

evidence or impeachment material. Whether the disclosure of alleged Brady material

could have led to the discovery of admissible evidence or impeachment material cannot

be based upon speculation; rather, there must be a _reasonable probability_ that if the

prosecution provided the Brady material to the defendant, a different result would have

occurred. Dennis, 834 F.3d at 310; Commw. v. Willis, 46 A.3d 648, 654 (Pa. 2012) (explaining that whether the "Commonwealth's failure to disclose…[inadmissible] evidence adversely affected the presentation of the defense at trial, or the defense's preparation for trial" cannot be based upon "mere speculation").

Here, Pinson does not argue the Brady material would be admissible. He asserts that the Brady issues he raises are impeachment material or that discovery could lead to impeachment material. The court will address those arguments below.

### ii.   Impeachment material

The admissibility of evidence in Pinson's state-court case is governed by the Pennsylvania Rules of Evidence. McDaniel v. Sorber, No. CV 21-738, 2022 WL 4988167, at *7 (E.D. Pa. Aug. 22, 2022), report and recommendation adopted, No. CV 21-738, 2022 WL 5027197 (E.D. Pa. Oct. 4, 2022) (analyzing the state-court petitioner's claim that his counsel was ineffective because he did not object to a cross examination of the state-court petitioner with respect to a prior conviction under the Pennsylvania Rules of Evidence); R.R. v. Beard, No. CIV.A. 09 - 1102, 2015 WL 5730784, at *56 (W.D. Pa. Sept. 30, 2015) (analyzing in a state-court petitioner's habeas case whether impeachment material would have been admissible at the petitioner's state-court trial under the Pennsylvania Rules of Evidence); Jones v. Kyler, No. CIV.A. 02-09510, 2003 WL 22331773, at *10 (E.D. Pa. July 23, 2003), report and recommendation adopted, No. CIV.A. 02-9510, 2007 WL 187689 (E.D. Pa. Jan. 22, 2007) (same).

Pennsylvania Rule of Evidence 607, entitled "Who May Impeach a Witness, Evidence to Impeach a Witness[,]" provides:

**(a) Who May Impeach a Witness.** Any party, including the party that called the witness, may attack the witness's credibility.

29

**(b) Evidence to Impeach a Witness.** The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules.

Pa. R. Evid. 607. The Supreme Court of Pennsylvania has explained: "It is well settled 'that a witness may be cross-examined as to any matter tending to show the interest or bias of that witness.'" Commw. v. Solano, 129 A.3d 1156, 1175 (Pa. 2015) (quoting Commw. v. Nolen, 634 A.2d 192, 195 (Pa. 1993)).

The comment to Rule 607, however, explains that there are limits to the admissibility of impeachment material:

> Pa.R.E. 607(b) applies the test for relevant evidence of Pa.R.E. 401 to evidence offered to impeach the credibility of a witness. As is the case under Pa.R.E. 402, there are limits on the admissibility of evidence relevant to the credibility of a witness imposed by these rules. For example, Pa.R.E. 403 excludes relevant evidence if its probative value is outweighed by danger of unfair prejudice, etc., and there are specific limitations on impeachment imposed by Rules 608, 609 and 610. There are statutory limitations such as 18 Pa.C.S. § 3104 (Rape Shield Law).

PA. R. EVID. 607, cmt. With respect to whether impeachment material is relevant under Pennsylvania Rule of Evidence 401, the Supreme Court of Pennsylvania has explained:

"'*Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' [sic] testimony.'*" Commw. v. Abu-Jamal, 555 A.2d 846, 853 (Pa. 1989) (quoting and adopting the rationale of United States v. Abel, 469 U.S. 45, 53 (1984) (emphasis in original)). "Bias" is defined as: "'the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party.'" Abu-Jamal, 555 A.2d at 853 (quoting Abel, 469 U.S. at 53).

Pennsylvania Rule of Evidence 608, entitled "A Witness's Character for Truthfulness or Untruthfulness[,]" imposes limits on the admissibility of certain impeachment material. Rule 608 provides:

**(a) Reputation Evidence.** A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked. Opinion testimony about the witness's character for truthfulness or untruthfulness is not admissible.

**(b) Specific Instances of Conduct.** Except as provided in Rule 609 (relating to evidence of conviction of crime),

(1) the character of a witness for truthfulness may not be attacked or supported by cross-examination or extrinsic evidence concerning specific instances of the witness' conduct; however,

(2) in the discretion of the court, the credibility of a witness who testifies as to the reputation of another witness for truthfulness or untruthfulness may be attacked by cross-examination concerning specific instances of conduct (not including arrests) of the other witness, if they are probative of truthfulness or untruthfulness; but extrinsic evidence thereof is not admissible.

PA. R. EVID. 608. Rule 608(b)(1) "prohibits the use of evidence of specific instances of conduct to support or attack credibility." PA. R. EVID. 608, cmt. One district court has explained:

In Pennsylvania, a witness's credibility can be challenged with crimen falsi evidence, see Commonwealth v. Harris, 442 Pa.Super. 116, 658 A.2d 811, 812 (1995) (quoting Commonwealth v. Randall, 515 Pa. 410, 528 A.2d 1326, 1329 (1987) ) ("evidence of prior convictions can be introduced for the purpose of impeaching the credibility of a witness if the conviction was for an offense involving dishonesty or false statements"), or by the witness's reputation or character for untruthfulness. See Pa.R.E. 608. As to the latter, evidence of reputation or character for truthfulness does not refer to specific instances of truthfulness or untruthfulness.

Charleston v. Gilmore, 305 F. Supp. 3d 612, 662 (E.D. Pa. 2018) (citing

Commw. v. Minich, 4 A.3d 1063, 1068 (Pa. Super. Ct. 2010)). The Pennsylvania

Supreme Court and the Superior Court of Pennsylvania "have repeatedly held that evidence that a witness has made false statements or engaged in dishonesty on other occasions is not admissible to impeach the witness's credibility." Commw. v. Keehn, 251 A.3d 1224 (Pa. Super. Ct. 2021) (collecting decisions).

Whether extrinsic evidence is admissible to impeach a witness is dependent upon whether the extrinsic evidence is relied upon the show the witness' bias or interest, pursuant to Rule 607, or the witness' character for truthfulness, pursuant to Rule 608. Commw. v. Kiger, No. 343 MDA 2019, 2019 WL 6465004, at *4 (Pa. Super. Ct. Dec. 2, 2019). The Superior Court of Pennsylvania in Kiger explained:

> If the impeachment evidence is relevant as to bias, then it is not collateral and subject to proof by extrinsic evidence. However, if the evidence is not relevant to bias but instead merely truthfulness, then it is collateral and not provable through extrinsic evidence. See Pa.R.E. 608(b)(1) ("[T]he character of a witness for truthfulness may not be attacked or supported by cross-examination or extrinsic evidence concerning specific instances of the witness' conduct[.]"); see also Commonwealth v. Guilford, 861 A.2d 365, 369 (Pa. Super. 2004) (noting a party may not impeach a witness on collateral matters or matters that have no relationship to the case at trial).

Id.

### iii. **The Manns Case**

With respect to the Manns case, the plaintiff in Manns sued Logan, among other Pittsburgh police officers and the City of Pittsburgh, pursuant to 42 U.S.C. § 1983, for violating his constitutional rights. (Civ. A. No. 00-838, ECF No. 1.) The plaintiff in Manns alleged that Logan and the other police officer defendants:

- interrogated the plaintiff for twelve and one-half hours (Civ. A. No. 00-838, ECF No. 1 ¶ 16), but did not charge him with any crimes (id. ¶ 21);

- denied the plaintiff water, food, medication, access to the bathroom, and use of a telephone (id. ¶ 17);

- denied the plaintiff medical attention when he complained about chest pain (id. ¶ 18);

- held the plaintiff in their custody against the plaintiff's will and despite plaintiff's request to leave (id. ¶ 19);

- screamed at the plaintiff and threatened him with arrest if he did not cooperate (id. ¶ 20); and

- caused the plaintiff injuries, e.g., bladder infection, chest pain, severe shock to his nervous system, and emotional distress (id. ¶ 24).

Pinson in his pending Rule 60(b) motion argues that the Manns material could have been used at his state-court trials to impeach Logan to prove Logan's "insidious intent." (ECF No. 40 at 8.) As the court understands it, Pinson argues that because Logan (allegedly) committed unlawful interrogations in the past, Logan lied when he testified about Pinson's confession in Pinson's state-court cases. To be clear, Pinson asserts that he did not confess, and that Logan lied when he testified that Pinson confessed. Pinson wants to impeach Logan and attack his character for truthfulness with extrinsic evidence of past allegedly unlawful interrogations that did not result in confessions. Pinson does not argue that the OMI report shows bias, interest, or any other permissible purpose for impeachment, pursuant to Rule 607.[5] Under those circumstances, the Manns material is

---

[5]    Even under Rule 607, the Manns material could not be used for impeachment purposes. First, as discussed below, the Manns case resulted in a settlement, and, therefore, there was never a finding of liability or guilt with respect to Logan. Allegations made in a civil lawsuit in which there was never a finding of liability are generally inadmissible as impeachment material in subsequent criminal cases. Dicks v. United States, Civ. A. No. 09-2614, 2010 WL 11484356, *5 n.10, *6 (analyzing Federal Rule of Evidence 608, which is similar—but not identical—to Pennsylvania Rule of Evidence 608, and holding that evidence of an internal affairs division investigation and civil lawsuits in which there were never findings of misconduct by three government witnesses was not admissible as impeachment material because "the probative value [of the material] was minimal in comparison to the grave risk of unfair prejudice") (citing decisions).

_____

Second, the material in issue would be subject to the Pennsylvania Rules of Evidence with respect to relevancy. A review of the record in this case shows that Pinson at trial and in his post-trial proceedings argued that he did not confess and that Logan fabricated Pinson's confession. See e.g., (ECF No. 9-34 at 20; ECF No. 9-35 at 2.) There are no allegations that the interrogations in Manns or the interrogations reported in the OMI report resulted in Logan fabricating a confession. Under those circumstances, even if the material in issue was arguably impeachment material under Rule 607, the evidence would be inadmissible under Pennsylvania Rules of Evidence 401-403. With respect to Rule 401, the material—because it is distinguishable from Pinson's account of what happened in his cases, i.e., Logan fabricated Pinson's confession—does not have "any tendency to make a fact [of consequence in the action] more or less probable than it would be without the evidence." PA. R. EVID. 401. Under those circumstances, the material in issue would not be admissible at trial. PA. R. EVID. 402.  Even if the material in issue *was* relevant to Pinson's cases, it would be excludable under Pennsylvania Rule of Evidence 403 because "its probative value is outweighed by the danger of…confusing the issues,…[or] misleading the jury." PA. R. EVID. 403. As discussed above, the facts underlying the allegations in Manns and the OMI report are distinguishable from the facts alleged by Pinson, i.e., Logan lied about fabricating Pinson's confession, and all the alleged Brady material relied upon by Pinson consists of allegations about collateral incidents, which courts have found to lack consequential probative value. See United States v. Xi, No. CR 16-22-5, 2021 WL 3910749, at *6 (E.D. Pa. Sept. 1, 2021) (holding that dismissed *allegations* in a civil suit were inadmissible in a criminal case under Federal Rule of Evidence 403) (citing decisions); United States v. Lawes, 292 F.3d 123, 131 (2d Cir. 2002) (affirming the decision of the district court that evidence that a civil complaint review board rejected testimony from a police officer and issued the police officer a citation was inadmissible to impeach the police officer at the defendant's criminal trial under the Federal Rules of Evidence because "the risk of distraction resulting from..[the defendant's] intended interrogation substantially outweighed any probative value of the evidence"). The probative value of the Manns material and the OMI report—if any—is, therefore, outweighed by the danger of confusing the issues and misleading the jury. Dicks, 2010 WL 11484356 at *5 n.10, *6.

Third, to the extent Pinson argues that he could have used the Manns material and the OMI report to show that—because Logan conducted unlawful interrogations in Manns and in the instances contained in the OMI report, he conducted an unlawful interrogation of Pinson in the state-court cases—the evidence would be inadmissible for that purpose pursuant to Pennsylvania Rule of Evidence 404(b), which provides: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." PA. R. EVID. 404(b).

governed by Rule 608(b)(1) because it is extrinsic evidence relied upon to impeach Logan by attacking Logan's character for truthfulness. The Manns material, therefore, would not be admissible during the trials of Pinson's state-court cases to attack Logan's character for truthfulness.

As discussed above, evidence may be considered Brady material if it is admissible, is impeachment material, or could have led to the discovery of admissible evidence or impeachment material. Pinson has not explained how the complaint and answer in Manns would have led his counsel to admissible evidence or impeachment material; indeed, the plaintiff and Logan, among other defendants, settled the Manns case and it was dismissed with prejudice.[6] Under those circumstances, Pinson could not satisfy his burden to show there is a reasonable probability that if the prosecution disclosed the Manns case to him during his state court trials, the outcome of those cases would have been different.

---

[6]    The court takes judicial notice of "the authenticity and existence of the docket entries, orders, and opinions publicly available" on a court's docket. FCS Cap. LLC v. Thomas, 579 F. Supp. 3d 635, 647 (E.D. Pa. 2022). The court takes judicial notice of the following with respect to the Manns case:

–    On June 27, 2002, the jury returned a verdict in favor of the plaintiff and against Logan and other police officers. (Civ. A. No. 00-838, ECF No. 52.)

-    Judgment was entered in favor of the plaintiff and against Logan and other police officers in the amount of $25,000.00. (Civ. A. No. 00-838, ECF No. 53.)

-    On July 9, 2002, the police officer-defendants filed a renewed motion for judgment as a matter of law. (Civ. A. No. 00-838, ECF No. 54.)

-    On November 26, 2002, the court granted the police officers' motion, vacated the judgment entered against them, and ordered a new trial. On the same date, the plaintiff and the defendants, including Logan, entered into a stipulation that the case be dismissed with prejudice. The stipulation was signed as an order of court. (Civ. A. No. 00-838, ECF No. 63.)

iv.    **The OMI Report**

The OMI report contained three summaries of reports by citizens accusing Logan of misconduct. The first summary, dated January 7, 1988, provides:

> Complainant alleged while the officers were arresting her son[,] things were knocked off of her wall by the officers and they were verbally abusive to her.

(ECF No. 9-19 at 33.) The second summary, dated November 26, 1996, provides:

> The complainant alleges that an arresting detective threatened and intimidated her son while questioning him about an assault and burglary.

(Id.) The third summary, dated October 13, 1998, provides:

> Complainant alleges that det. Choked [sic] him as he was interviewing him about a homicide.

(Id.)

Pinson argues that the prosecution in his state-court cases violated Brady when it failed to provide him the OMI report because he could have used the OMI report to impeach Logan. As discussed above, Pinson argues the OMI report could be used to impeach Logan to prove his "insidious intent[,]" i.e., to show that because Logan (allegedly) committed unlawful interrogations in the past (that do not appear to have resulted in confessions), Logan unlawfully interrogated Pinson and falsified a confession by Pinson. Pinson testified that he did not confess,[7] and, therefore, Logan's testimony about the confessions by Pinson and Boyer is false. (ECF No. 40 at 8.) Pinson does not argue that the OMI report shows bias, interest, or any other permissible purpose for impeachment, pursuant to Rule 607. Specific instances of conduct, i.e., the instances reported in the OMI report, however, cannot be used to attack a witness' credibility,

---

[7]    There was a suppression hearing held in the state trial court, and Pinson's confession was not suppressed. (ECF No. 9-34 at 33-38.) Pinson does not raise any issue with respect to the suppression hearing in the pending Rule 60(b) motion.

pursuant to Pennsylvania Rule of Evidence 608. Pinson, therefore, could not have used the three complaints about Logan's alleged misconduct listed in the OMI report to impeach Logan during his state-court trials.

Pinson in his objections requests an evidentiary hearing to show that the prosecution knew about the OMI report, but did not provide it to him before his state-court trials. Even if the prosecution knew about the OMI report, however, Pinson in his Rule 60(b) motion did not make any showing that the OMI report was admissible evidence, impeachment material, or its production to Pinson before his state-court trials would have led his counsel to find admissible evidence or impeachment material.[8] Indeed, Pinson was appointed counsel when he filed his third PCRA petition and raised the prosecution's failure to turn over the OMI report as a basis for relief. The appointed counsel, however, filed a no merit letter and explained:

> Without any verification through a fact finding investigation, the mere existence of three unsubstantiated complaints against an officer in ten years does not constitute material exculpatory evidence for the purpose of a PCRA claim. Had the jury learned that, in ten years, two criminal defendants had complained about improper interrogation techniques, without proof of fact, there does not exist a reasonable probability that the outcome of the entire case would have been different. If anything, the existence of such a small number of unverified complaints would likely bolster the officer's credibility. Therefore, Petitioner cannot demonstrate that relevant and material exculpatory evidence was withheld and the argument is without merit.

(ECF No. 9-21, p.6.)

Under those circumstances and as discussed above, see supra note 5, Pinson did not show that there is a reasonable probability that if the prosecution provided the OMI

---

[8]     The disclosure of the OMI report to Pinson during his state-court trials would not have led to the discovery of material that could be used for impeachment purposes. See supra note 5.

report to Pinson or his counsel that the outcome of the state-court trials would have been different. For these same reasons, Pinson's request for an evidentiary hearing, motion for court order to unseal records and order the Commonwealth to turn over all internal affairs records with respect to detective Dennis Logan (ECF No. 48), motion for subpoena duces tecum (ECF No. 51) and will be denied because he has not made the requisite showing that the OMI report will lead to the discovery of <u>Brady</u> material.

### v.   <u>Conclusion with respect to the merits of the underlying claim factor</u>

Based upon the foregoing, this <u>Cox</u> factor, i.e., the merits of the underlying claims, weighs against a finding of extraordinary circumstances warranting Rule 60(b)(6) relief.

### c.  Principles of finality and comity factor

The court in <u>Lamas</u> explained:

> Federal courts must "pay ample respect to states' criminal judgments" and should be particularly reluctant to disturb those judgments via Rule 60(b) relief. <u>Cox</u>, 757 F.3d at 125. "In that vein, a district court reviewing a habeas petitioner's 60(b)(6) motion may consider whether the conviction and initial federal habeas proceeding were only recently completed or ended years ago. Considerations of repose and finality become stronger the longer a decision has been settled." <u>Id.</u> (citing <u>Gonzalez</u>, 545 U.S. at 536-37).

<u>Lamas</u>, 2022 WL 4111865, at *11. The court in <u>Lamas</u> held that this factor weighed against a finding of extraordinary circumstances under Rule 60(b)(6) because the defendant's "conviction and sentence became final nearly thirty years…[earlier], and his habeas corpus petition had been dismissed for four years before <u>Dennis</u> was decided." <u>Id.</u>

Here, Pinson's conviction and sentence became final at CP-02-CR-0013750-1999 on November 26, 2002, i.e., more than 20 years ago, and his conviction and sentence became final at CP-02-CR-0014157-1999 on June 28, 2004, i.e., nearly 19 years ago. This court dismissed his petition as untimely on November 24, 2014, (ECF No. 15) and

the Third Circuit Court of Appeals denied him a certificate of appealability on July 21, 2015 (ECF No. 19). The petition, therefore, had been dismissed as untimely for more than six years when <u>Bracey</u> was decided. This factor, therefore, weighs in favor of denying Pinson relief and against a finding of extraordinary circumstances in this case.

### d.  The petitioner's diligence in pursuing review factor

This factor weighs in favor of finding extraordinary circumstances exist in this case because Pinson filed the pending Rule 60(b) motion raising <u>Bracey</u> on July 18, 2021, i.e., less than six months after <u>Bracey</u> was decided. As the court explained in <u>Lamas</u>, however, a petitioner's diligence alone is not a sufficient basis upon which to find extraordinary circumstances warranting Rule 60(b)(6) relief. <u>Lamas</u>, 2022 WL 4111865, at *11.

### e.  The imperative of correcting a fundamentally unjust incarceration

As explained above, neither the OMI report nor the <u>Manns</u> case is <u>Brady</u> material. As described below, Pinson did not make the requisite showing that he is actually innocent of any of the crimes with which he was charged. Under those circumstances, this case does not present a circumstance in which the court must correct a fundamentally unjust incarceration because Pinson did not make the requisite showing that his incarceration is—in fact—fundamentally unjust. This factor, therefore, does not weigh in favor of granting Pinson relief.

### f.  Conclusion with respect to the <u>Cox</u> factors

The only <u>Cox</u> factor that weighs in favor of granting Pinson relief is his diligence in filing the pending Rule 60(b) motion approximately six months after <u>Bracey</u> was decided. The other factors weigh against granting the relief requested.

### 3.  Conclusion with respect to intervening law as a basis to find extraordinary relief

After considering <u>Bracey</u> and weighing the <u>Cox</u> factors, this court must conclude that Pinson did not satisfy his burden to show he is entitled to Rule 60(b)(6) relief.

### C.  Actual Innocence

Pinson in his objections did not make any "specific written objections" to the magistrate judge's finding that Pinson failed to satisfy his burden to show that extraordinary circumstances exist in this case because he is actually innocent of the crimes of which he was convicted. Pinson relies upon an affidavit by Michael Javon Snowden. Pinson in his Rule 60(b) motion argues:

> The new evidence comes in the form of a notarized affidavit signed by Michael Javon Snowden, who along with John Carter, was arrested in control and possession of the vehicle used in the robbery for which petitioner is currently convicted. Snowden admits (1) to being arrested in the getaway car, (2) fabricating his identification of Petitioner as a culprit at the assault(s) at CC199913750, and (3) that Detective Dennis Logan promised Snowden that he would not have to testify against petitioner.

(ECF No. 40 at 6-7.) Snowden's affidavit provides:

> On September 15, 1999, myself along with my friend, John Carter fled from a stolen gold Cadillac that was used in the robbery of the QuiCash on Frankstown Avenue. Mr. Carter and I were later arrested by the PITTSBURGH Police. While in custody, Carter told me that they were going to lock him up for a long time and persuaded me to lie to officers and tell them that Pierre Pinson and Ricky Boyer did the Zone 6 police station shooting, so that we could go free. At first, I was hesitant until Detective Dennis Logane [sic] assured me that when he was…done with Pinson and Boyer, I would not have to testify. He then showed me a picture of each of them and I positively identified them as the shooters.
>
> I was forced to lie in order to help my friend John Carter. This has weighed heavily on my conscience and I am now coming forward to help free two innocent men.

(ECF No. 41 at 6.)

The magistrate judge in the R&R correctly found that Pinson did not satisfy his burden to show that extraordinary circumstances exist warranting Rule 60(b)(6) relief

based upon actual innocence. Pinson in his "objections," did not make any specific written objections to those findings by the magistrate judge. Under those circumstances and as described above, the court must review the R&R for plain error. Flagstar Bank, 2018 WL 4517447, at *1; Price, 2022 WL 4133341, at *1. This court, therefore, will review the R&R with respect to this issue to determine whether the magistrate judge's denial of the pending Rule 60(b) issue with respect to Pinson's attempt to show actual innocence was plain error.[9]

As the magistrate judge explained in the R&R, a Rule 60(b)(6) petitioner may show that extraordinary circumstances exist for relief if he or she can "make the required credible showing of actual innocence to avail himself of the fundamental miscarriage of justice exception" to AEDPA's one-year statute of limitations.  Satterfield v. Dist. Att'y Philadelphia, 872 F.3d 152, 155 (3d Cir. 2017); (ECF No. 44 at 17.) The Third Circuit Court of Appeals has explained that "the fundamental miscarriage-of-justice exception" to AEDPA's one-year statute of limitations is "grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." Id. (quoting McQuiggin v. Perkins, 569 U.S. 383, 392 (2013)).[10] One district court has explained:

---

[9]     Even if the court applied the de novo standard of review to the magistrate judge's recommendation that Pinson did not satisfy his burden to show that extraordinary circumstances exist in this case because he is actually innocent of any crimes with which he was charged, the court would adopt the R&R of the magistrate judge for the reasons set forth in this opinion with respect to Pinson's actual innocence claim.

[10]    The court of appeals in Satterfield further explained:

Underlying the fundamental-miscarriage-of-justice exception is a "[s]ensitivity to the injustice of incarcerating an innocent individual," and the doctrine aims "to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in

> To satisfy the actual innocence standard…"a petitioner must [first] present new, reliable evidence" and second, "show by a preponderance of the evidence 'that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " Reeves v. Fayette SCI, 897 F.3d 154, 160 (3d Cir. 2018) (quoting Houck v. Stickman, 625 F.3d 88, 93 (3d Cir. 2010) (further quotations omitted)). Stated differently, a petitioner must establish that it is "more likely than not any reasonable juror would have reasonable doubt." Reese, 897 F.3d at 1601–6 (quoting House v. Bell, 547 U.S. 518, 538 (2006)).

Boretsky v. Davis, No. CV 09-771 (FLW), 2019 WL 5967999, at *3 (D.N.J. Nov. 13, 2019).

With respect to the first step of this assessment, i.e., whether the evidence relied upon by the petitioner is "reliable and new," the Third Circuit Court of Appeals has explained: "As part of the reliability assessment of the first step, the court 'may consider how the timing of [the petitioner's] submission and the likely credibility of the [witnesses] bear on the probable reliability of that evidence,' as well as the circumstances surrounding the evidence and any supporting corroboration." Reeves v. Fayette SCI, 897 F.3d 154, 161 (3d Cir. 2018), as amended (July 25, 2018). "Typically, 'new reliable evidence' consists of 'exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" Jackson v. Wenerowicz,

---

justice that arises in the extraordinary case." Id. at 1932. For this reason, " '[i]n appropriate cases,' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.' " Murray v. Carrier, 477 U.S. 478, 495, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (quoting Engle v. Isaac, 456 U.S. 107, 135, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)) (alteration in the original). The Supreme Court has underscored the importance of these principles, explaining that "concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the 'fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.' " Schlup, 513 U.S. at 325, 115 S.Ct. 851 (quoting In re Winship, 397 U.S. 358, 372, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)).

Satterfield, 872 F.3d at 162.

No. CV 14-2996, 2021 WL 2072230, at *3 (E.D. Pa. May 24, 2021), certificate of appealability denied sub nom. Jackson v. Superintendent Phoenix SCI, No. 21-2179, 2021 WL 6201382 (3d Cir. Sept. 10, 2021) (quoting Schlup v. Delo, 513 U.S. 298, 324 (1995)). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup, 513 U.S. at 324.

With respect to "recantation" evidence, the Third Circuit Court of Appeals has explained:

> "[C]ourts have historically viewed recantation testimony with great suspicion." Landano v. Rafferty, 856 F.2d 569, 572 (3d Cir. 1988). As a general matter, a recantation in the absence of corroborating evidence or circumstances will probably fall short of the standard of reliability contemplated by Schlup. But that does not mean that recantation evidence is to be categorically rejected. On the contrary, "there are no categorical limits on the types of evidence that can be offered" under Schlup. Hyman v. Brown, 927 F.3d 639, 660 (2d Cir. 2019). Like any other form of evidence, recantations should be analyzed on an individual and fact-specific basis, taking into account the non-exclusive factors outlined in *Reeves*.

Howell v. Superintendent Albion SCI, 978 F.3d 54, 60 (3d Cir. 2020).

With respect to the second step of the analysis, i.e., whether it is more likely than not that no reasonable juror would convict the petitioner, the Third Circuit Court of Appeals has explained:

> The court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House, 547 U.S. at 538, 126 S. Ct. 2064 (internal quotation marks and citation omitted). "[M]ere impeachment evidence is generally not sufficient to satisfy the [gateway actual innocence] standard." Munchinski v. Wilson, 694 F.3d 308, 338 (3d Cir. 2012). However, new, reliable evidence that "undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime]" can suffice to show actual innocence. Goldblum v. Klem, 510 F.3d 204, 233 (3d Cir. 2007); see also Munchinski, 694 F.3d at 336-37 (explaining that actual innocence was demonstrated where new evidence both showed that the crime could not have happened in the way the Commonwealth presented at trial and provided an alternative theory that was more appropriate and better fit the facts of the case). In weighing the

> evidence, "[t]he court's function is not to make an independent factual
> determination about what likely occurred, but rather to assess the likely
> impact of the evidence on reasonable jurors"; the actual innocence standard
> "does not require absolute certainty about the petitioner's guilt or
> innocence." <u>House</u>, 547 U.S. at 538, 126 S. Ct. 2064.

<u>Reeves</u>, 897 F.3d at 160-61.

With respect to the first step of the analysis, the magistrate judge in the R&R

explained that Pinson presented Snowden's affidavit to the Superior Court of

Pennsylvania, which rejected his argument that the affidavit was "new." The Superior

Court of Pennsylvania explained:

> [C]ontrary to Pinson's assertions, Pinson was aware of Snowden's
> involvement in this case since at least September 2003. See PCRA Court
> Opinion, 11/8/07, at 2-3 (wherein the PCRA court, in addressing Pinson's
> second PCRA Petition, summarized that Pinson filed his second PCRA
> Petition in September 2003, and raised his claim that all prior counsel were
> ineffective for failing to call Snowden and Carter as witnesses). Moreover,
> other than a bald assertion of Snowden's unavailability for 16 years, Pinson
> provides no explanation of the steps he took to secure the Snowden
> Affidavit, nor any pitfalls or delays.

<u>Commw. v. Pinson</u>, No. 933 WDA 2020, 2021 WL 4932802, at *4 (Pa. Super. Ct. Oct. 22,

2021) (internal citations to decisions omitted). The magistrate judge, however, did not

conclude whether Snowden's affidavit was "new or reliable" because, in any event,

Pinson did not satisfy his burden to show that it is more likely than not that if Snowden

testified at Pinson's trials, no reasonable juror would have convicted him. The magistrate

judge explained:

> Notwithstanding the question of whether this evidence qualifies as
> "new" or "reliable",…Snowden's Affidavit does not persuade the Court that
> no juror acting reasonably would have voted to convict Petitioner of the
> shooting of the Zone 6 police station had Snowden testified that he lied to
> the police about Petitioner's involvement in the shooting. First, it is noted
> that Snowden and Carter were not called to testify at Petitioner's trial, and,
> therefore, the information in Snowden's Affidavit pertains only to the quality
> of the information given to the police during their investigation and is not
> considered a recantation of testimony given under oath at Petitioner's trial.

Additionally, the Affidavit does not undermine the trial evidence that pointed to Petitioner as the perpetrator of the shooting of the Zone 6 police station, which the Superior Court characterized as "overwhelming" in Petitioner's direct appeal. Simply put, Petitioner has not made a sufficient showing of his actual innocence such that Rule 60(b) relief should be granted.

In support of his assertion of innocence as it pertains to the charges stemming from the robbery of the QwiCash store on August 31, 1999, Petitioner seemingly argues that he could not have participated in the robbery because only three people were seen fleeing the scene in the gold Cadillac and all three were accounted for – Snowden and Carter were arrested in the stolen gold Cadillac on September 15, 1999, and Boyer was identified as one of the robbers by witnesses at the trial. However, Petitioner's logic is fundamentally flawed since Snowden and Carter's arrest in the stolen gold Cadillac on September 15, 1999, does not automatically equate to their participation in the QwiCash robbery 15 days earlier, nor does it establish Petitioner's non-participation. Petitioner also appears to argue that he is actually innocent of the QwiCash robbery because Leroy Collington, who identified Petitioner out of a photo array on September 15, 1999, was a "failed jailhouse snitch who once fabricated testimony in a homicide case." He also claims that the identification was somehow suspect because it was made on the same day that Snowden and Carter were arrested and because the photo array shown to Collington did not contain any identifying marks, nor did it contain Collington's signature or initials, which Petitioner claims "is procedure substantiating identification." This evidence similarly does not establish Petitioner's innocence but instead attacks Collington's credibility and the procedures used to establish his identification of Petitioner. See Sistrunk v. Rozum, 674 F.3d 181, 191 (3d Cir. 2012) ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency.") (quoting Bousley v. United States, 523 U.S. 614, 623 (1998)).

(ECF No. 44 at 19-20.)

The court agrees with the foregoing analysis by the magistrate judge that Pinson did not satisfy his burden to show that—if Snowden testified at trial in accordance with his affidavit—it is more likely than not that no reasonable juror would have convicted Pinson. As described above, Pinson did not satisfy his burden to show that the alleged Brady material was in fact Brady material that would have been admissible to impeach Logan's testimony or would have led to evidence that could have been used to impeach his testimony. The jury heard evidence that both Boyer and Pinson confessed to the shooting

at the Zone 6 police station and circumstantial evidence, i.e., Pinson's tattoos and jail drawings, connected him to the Jeep used during the shootings. The jury also heard evidence that Pinson confessed to attempting to rob the QwiCash store and robbing it on August 31, 1999. Based upon the foregoing, even if Snowden's testimony was presented to the juries in Pinson's state-court cases, it is not more likely than not that the jury would have acquitted him. Ample evidence of record remained on which the juries could have convicted him of the crimes with which he was charged and ultimately convicted.

The court adopts the R&R with respect to the magistrate judge's conclusion and analysis with respect to this issue. Pinson did not satisfy his burden to show that extraordinary circumstances exist in this case that warrant Rule 60(b)(6) relief based upon Pinson's actual innocence.

### D. Other motions pending before the court

As explained above, Pinson did not make the requisite showing that the OMI report or the Manns case would lead to the discovery of Brady material. For those reasons, Pinson's request for an evidentiary hearing, motion for court order to unseal records and order the Commonwealth to turn over all internal affairs records with respect to detective Dennis Logan (ECF No. 48), and motion for subpoena duces tecum (ECF No. 51) will be denied. Having received no objection to Pinson's motion to withdraw the addendum (ECF No. 50) the motion will be granted.

### V.   Conclusion

The court adopts the R&R, as modified and supplemented in this opinion, and overrules Pinson's objections to the R&R (ECF No. 47). Pinson's pending Rule 60(b)(6) (ECF No. 40) will be denied for the reasons set forth in the R&R, as modified and supplemented by this opinion, and a certificate of appealability will not be issued.

The motion for court order to unseal records and order the Commonwealth to turn over all internal affairs records with respect to detective Dennis Logan (ECF No. 48) and motion for subpoena duces tecum (ECF No. 51) will be denied. The motion to withdraw addendum (ECF No. 49) will be granted.

An appropriate order will be entered.

BY THE COURT,

Dated: March 30, 2023                    **/s/ JOY FLOWERS CONTI**
                                          Joy Flowers Conti
                                          Senior United States District Court Judge